ROBERT F. GREEN *v.* HERBERT J. KAROL.

[No. 3-174A16.  Filed March 17, 1976.]

*C. David Peebles,* of Fort Wayne, for appellant.

*Clifford E. Simon, Jr., Shoaff, Keegan, Baird & Simon,* of Fort Wayne, for appellee.

STATON, P.J.—In early 1967, Dr. Robert Green purchased securities issued by Igenio la Garita S.A., a Costa Rican corporation. Green paid the corporation $30,000.00 for these securities, which were issued in $6,000.00 units consisting of one debenture with a face value of $5,850.00 and one share of stock with a face value of $150.00. Green received ten shares of stock and no debentures. At the time of the transaction, the securities of the corporation were not registered under the Indiana Securities Law[1] or under federal law.[2]

During the fall and winter of 1966, Dr. Herbert Karol had actively encouraged Green to purchase the corporation's securities. Karol had arranged and attended several formal and informal meetings and talks with Green, at which times Karol spoke highly of the prospects of the corporation and its management.

Green instituted the present action against Karol in May 1972, alleging in four counts that Karol was liable to Green for the purchase price of the securities on the following theories:

   (1) selling and delivering securities in violation of federal and state securities laws (Count I) ;
   (2) money had and received (Counts II and III) ; and
   (3) common law fraud (Count IV).

Karol was defaulted for failure to plead, but the default entry was set aside. Trial by jury began on August 22, 1973. After Green presented his evidence, the trial court granted

---

1. IC 1971, 23-2-1-1 to 23-2-1-25 (Burns Code Ed.).
2. Securities Act of 1933, 15 U.S.C. §§ 77a-77aa (1970).

Karol's motion for directed verdict as to Counts I, II, and III.[3] In his appeal to this Court, Green raises the following issues:

(1) Did the trial court abuse its discretion when it set aside the entry of default for failure to plead?

(2) Did the trial court err in directing a verdict for Karol on the issues of securities law violations and money had and received?

We conclude that the trial court committed no reversible errors, and we affirm.

## I.

### Default

Judgments by default are governed by Indiana Rules of Procedure, Trial Rule 55, which provides in part:

"(A) Entry. When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise comply with these rules and that fact is made to appear by affidavit or otherwise, the party may be defaulted.

"(B) Default judgment. In all cases the party entitled to a judgment by default shall apply to the court therefor; but no judgment by default shall be entered against a person known to be an infant or incompetent unless represented in the action by a general guardian committee, conservator, or other such representative who has appeared therein. If the party against whom judgment by default is sought has appeared in the action, he . . . shall be served with written notice of the application for judgment at least three [3] days prior to the hearing on such application. If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearing or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required.

"(C) Setting aside default. A judgment by default which has been entered may be set aside by the court for the grounds and in accordance with the provisions of Rule 60 (B)."

3. The cause was submitted to the jury on the common law fraud theory (Count IV), and the jury returned a verdict for Karol on that theory. Green does not contest on appeal the jury's verdict.

Trial Rule 55(A) provides the basis for holding a party in default. If a party is in default, or can be defaulted, then Trial Rule 55(B) provides the procedure for obtaining a default judgment. See W. HARVEY, 3 INDIANA PRACTICE 34-35 (Supp. 1975). Once a judgment by default has been entered, Trial Rule 55(C) provides that it can be set aside only in accordance with the grounds and procedures of Trial Rule 60(B).[4]

Even though there is a technical default, the nondefaulting party is not entitled to a judgment by default as a matter of right. The decision whether or not to enter a judgment by default is within the sound discretion of the trial court. *Citizens Nat'l Bank* v. *First Nat'l Bank* (1975), 165 Ind. App. 116, 331 N.E.2d 471. *See also, e.g., Duling* v. *Markun* (7th Cir. 1956), 231 F.2d 833, *cert. denied,* 352 U.S. 870, 77 S.Ct. 96, 1 L.Ed.2d 76; *Papagianakis* v. *The Samos* (4th Cir. 1950), 186 F.2d 257, *cert. denied,* 341 U.S. 921, 71 S.Ct. 741, 95 L.Ed. 1354 (1951). The trial court's discretion is considerable. On the one hand, a default judgment plays an important role in the maintenance of an orderly, efficient judicial system as a weapon for enforcing compliance with the rules of procedure and for facilitating the speedy determination of litigation. On the other hand, there is a marked judicial preference for deciding disputes on their merits and for giving parties their day in court, especially in cases involving material issues of fact,[5] substantial amounts of money,[6] or weighty policy determinations.[7] See

---

4. Originally, Indiana Trial Rule 55(C), like the federal rule, provided:

"(C) Setting aside default. For good cause shown the court may set aside an entry of default. A judgment by default which has been entered may be set aside by the court for the grounds and in accordance with the provisions of Rule 60(B)."

5. *See, e.g., Gill* v. *Stolow* (2d Cir. 1957), 240 F.2d 669 (issues of fraud).

6. *See, e.g., Henry* v. *Metropolitan Life Ins. Co.* (W.D. Va. 1942), 3 F.R.D. 142.

7. *See, e.g., General Motors Corp.* v. *Blevins* (D. Colo. 1956), 144 F. Supp. 381 (constitutionality of statute).

C. WRIGHT & A. MILLER, 10 FEDERAL PRACTICE AND PROCEDURE § 2681 (1973). The trial court, in its discretion, must balance these factors in light of the circumstances of each case.

In the present case, the summons and complaint were served on Karol on May 3, 1972, and Karol's counsel entered an appearance on May 10, 1972. On June 5, 1972, Green filed an affidavit for default for failure to plead. A hearing was set for August 11, 1972, and notice was sent to Karol's counsel. On June 14, 1972, Karol's counsel filed a motion to set aside the default entry and, on June 20, 1972, filed a supplemental motion, in which he stated:

> "5. By reason of the press of business, preoccupation of Counsel therewith and the inadvertent scheduling of Karol's file, within Counsel's Office, the time for filing a responsive pleading and/or motion expired without knowledge of counsel.
> "6. Karol has a meritorious defense to Plaintiff's Complaint and the setting aside of the default taken herein against Karol could not, in any manner, prejudice the rights of the parties hereto."

On July 18, 1972, after argument and before a default judgment was entered against Karol, the trial court set aside the default. Karol filed an answer to the complaint on July 24, 1972, and trial by jury began on August 22, 1973.

Our review is for an abuse of discretion by the trial court when it set aside the default entry and allowed Karol to plead. *Clark County State Bank* v. *Bennett* (1975), 166 Ind. App. 471, 336 N.E.2d 663. The defaulted party has the burden to show the trial court why a default judgment would result in an injustice and why his failure to plead should be excused. *See Moldwood Corp.* v. *Stutts* (5th Cir. 1969), 410 F.2d 351; *Clark County State Bank* v. *Bennett, supra* (setting aside default judgment). However, a default judgment is not generally favored, and any doubt of its propriety must be resolved in favor of the defaulted party. *See, e.g., Finch* v. *Big Chief Drilling Co.* (E.D. Texas 1972),

56 F.R.D. 456; *Indiana Travelers' Accident Ass'n* v. *Doherty* (1919), 70 Ind. App. 214, 123 N.E. 242. If we consider the substantial amount of money involved in the present case, the material issues of fact accompanying the allegations of common law fraud and securities law violations, the existence of a meritorious defense to the action, the apparent inadvertence of the delay, the short length of the delay, and lack of prejudice to Green by the delay, we conclude that the trial court did not abuse its discretion in allowing the case to be heard on the merits.

Green argues that Karol's allegations of "press of business" and "inadvertent scheduling" amount only to negligence, which cannot be condoned and which does not establish "excusable neglect." *Minneapolis Brewing Co.* v. *Merritt* (D. N.D. 1956), 143 F.Supp. 146; *Federal Enterprises, Inc.* v. *Frank Allbritten Motors, Inc.* (W.D. Mo. 1954), 16 F.R.D. 109. TR. 55 does not impose explicit standards to be applied by the trial court when it is setting aside a mere *entry* of default. Only when a *default judgment* has been entered does TR. 55(C) call into play the TR. 60(B) standards, one of which is "excusable neglect." In determining whether or not to enter a default judgment after a technical default has been noted, the trial court must exercise its discretion in light of all the circumstances of the case. *See Kreczmer* v. *Allied Constr. Co.* (1972), 152 Ind. App. 665, 284 N.E. 2d 869.

## II.
### Directed Verdict

When a motion for judgment on the evidence (directed verdict) is made under Trial Rule 50 of the Indiana Rules of Procedure, the court must draw all fair and rational inferences from the evidence in favor of the party opposing the motion. The motion should be granted only when there is insufficient evidence to support a verdict for the non-moving party, that is, when there is a lack of

evidence upon one of the factual issues necessary to support the verdict or when a defense to the action is proved by the evidence. *Miller* v. *Griesel* (1974), 261 Ind. 604, 308 N.E.2d 701, 707; *Mamula* v. *Ford Motor Co.* (1971), 150 Ind. App. 179, 275 N.E.2d 849.

We conclude that the trial court did not err in directing a verdict for defendant Karol on the issues of violation of the Indiana Securities Law, violation of federal securities laws, and money had and received. The securities law violations were barred by the applicable statutes of limitations, a defense, and there is no evidence to support liability on the theory of money had and received.

### A. Indiana Securities Law Violations

Green purchased securities in Ingenio la Garita S.A. by checks dated January 19, 1967 (a downpayment of $5,000.00) and February 24, 1967 (the balance of the $30,000.00 purchase price). Green commenced the present action on May 3, 1972. In early 1967, the statute of limitations provision of the Indiana Securities Law was as follows:

> "No person may sue under this section more than two [2] years after the contract of sale. . . ." Ch. 333, § 507, [1961] Ind. Acts 984 (amended 1969, 1975) (The present version of the statute of limitations is found at IC 1971, 23-2-1-19(e) (Burns Supp. 1975)).

Effective August 18, 1969, this statute of limitations was amended as follows:[8]

> "Action under this section shall be commenced within two [2] years after discovery by the person bringing the action of a violation of this act [23-2-1-1—23-2-1-25], and not afterwards. . . ." Ch. 190, § 3, [1969] Ind. Acts 541 (amended 1975).

The general rule is that the statute of limitations in force

---

8. IC 1971, 23-2-1-19(e) (Burns Supp. 1975) now provides:
   "Action under this section shall be commenced within three [3] years after discovery by the person bringing the action of a violation of this chapter, and not afterwards. . . ."

at the time of suit governs, even though it shortens or lengthens the period of limitation. *Myers* v. *Hoover* (1973), 157 Ind. App. 310, 300 N.E.2d 110; *Sansberry* v. *Hughes* (1910), 174 Ind. 638, 92 N.E. 783. However, it is well-established that if, while the old statute was in force and before plaintiff's suit was commenced, plaintiff's right of action was barred by that statute, no statute subsequently passed can renew defendant's liability. *McKinney* v. *Springer* (Ind. 1847), 8 Blackf. 506; *Stipp* v. *Brown* (1851), 2 Ind. 647; *Right* v. *Martin* (1858), 11 Ind. 123; *Oberg* v. *D. O. McComb & Sons* (1957), 127 Ind. App. 278, 141 N.E.2d 135.

In the present case, the statute of limitations in force at the time Green purchased the corporation's securities provided that no suit could be brought "more than two [2] years after the contract of sale." Under this statute, Green's action against Karol was barred in February 1969. The amendment, effective August 1969, could not serve to revive the barred cause of action.

Since Green's action for violations of the Indiana Securities Law was barred by the applicable statute of limitations, Karol's motion for a directed verdict was properly granted.

## B. Federal Securities Law Violations

Karol's liability to Green for selling and delivering securities in violation of federal securities laws, Securities Act of 1933, 15 U.S.C. §§ 77a-77aa (1970); Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78hh (1970), could have been based on any one of the following statutory provisions:[9]

15 U.S.C. § 77*l* (civil liabilities arising in connection with prospectuses and communications)

---

9. In the present case, the parties stipulated that no registration statement was filed by or on behalf of the corporation. Therefore, liability under 15 U.S.C. § 77K (1970) on account of false registration statements is foreclosed.

15 U.S.C. §77q (fraudulent interstate transactions)

15 U.S.C. §78j (manipulative and deceptive devices) (and Rule 10b-5 of the Securities and Exchange Commission).

The statute of limitations applicable to claims under 15 U.S.C. § 77*l* (1970) is as follows:

"No action shall be maintained to enforce any liability created under section 77k or 77*l*(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77*l*(1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77*l*(1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(2) of this title more than three years after the sale." 15 U.S.C. § 77m (1970).

Section 77*l*(1) provides that any person who "offers or sells a security in violation of section 77e . . . shall be liable to the person purchasing such security from him. . . ." The pertinent provisions of section 77e prohibit the use of interstate commerce (1) in the sale or delivery after sale of any security or prospectus unless a registration statement is in effect as to the security, (2) in the transmission of a security for the purpose of sale of delivery after sale unless accompanied or preceded by an adequate prospectus, or (3) in offering to sell or offering to buy a security unless a registration statement has been filed. Assuming, without deciding, that Karol violated these provisions, it is clear that the violation occurred at least by the time of Green's purchase of the unregistered securities in February 1967. By the explicit terms of the federal statute of limitations, Green's action for a violation of section 77*l*(1) was barred in February 1968, one year after the transaction in violation of the statute.[10]

10. The stock certificates were delivered to Green in December 1966. No debentures were ever delivered to him.

Section 77*l*(2) imposes civil liability upon any person who offers or sells a security by means of an oral communication which includes a misstatement or omission of a material fact. By the explicit terms of the federal statute of limitations, Green's action against Karol for a violation of this section was barred in February 1970, "three years after the sale."

Insofar as Karol's liability to Green under 15 U.S.C. §§ 77q. 78j, and Rule 10b-5 is concerned, there is no general federal statute of limitations applicable to those sections. The applicable statute of limitations is that governing securities law violations in the state of the forum. *Parrent* v. *Midwest Rug Mills, Inc.* (7th Cir. 1972), 455 F.2d 123; *Vanderboom* v. *Sexton* (8th Cir. 1970), 422 F.2d 1233, *cert. denied,* 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90, *Hitchcock* v. *deBruyne* (D. Conn. 1974), 377 F.Supp. 1403; *Corey* v. *Bache & Co.* (D.W. Va. 1973), 355 FSupp. 1123. Typically, federal courts, when turning to the law of the state of the forum, must determine whether to apply the state's general fraud statute of limitations or the statute of limitations contained in the state's securities law. *E.g., Parrent* v. *Midwest Rug Mills, Inc., supra; Vanderboom* v. *Sexton, supra; Corey* v. *Bache & Co., supra.* In determining which statute to apply, these courts look to the statute that best effectuates the policy of protecting victims of securities fraud and overreaching and that most closely tracks the express limitation periods in the federal act. *Id.*

Although the time period set forth in the applicable state statute of limitations governs in actions for violations of sections 77q, 78j, and Rule 10b-5 of the federal securities law, the federal courts have consistently held that the statutory period begins to run when the fraud is discovered or should have been discovered by the exercise of reasonable diligence. In *Parrent* v. *Midwest Rug Mills, Inc., supra,* 455 F.2d at 128, the Seventh Circuit Court of Appeals stated:

"We must read into the three year limitation applied in the Rule 10b-5 count the 'equitable doctrine' that the statute does not begin to run until the fraud is discovered where a plaintiff injured by fraud 'remains in ignorance of it without any fault or want of diligence or care on his part . . . Bailey v. Glover, 21 Wall. 342, 348, 22 L.Ed. 636.' Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946)." (footnote omitted).

In *Vanderboom* v. *Sexton, supra,* 422 F.2d at 1240, the Eighth Circuit Court of Appeals discussed this interpretation of state statutes of limitations when applied to federal securities law violations:

"Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946) held that where the cause of action is federal in origin but a forum state's statute of limitations is being used, and the action is equitable in nature, federal law applies in regard to determining the date on which a statute of limitations begins to run. Federal law since the case of Bailey v. Glover, 88 U.S. 342, 21 Wall. 342, 22 L.Ed. 636 (1875) has been that in cases involving elements of fraud neither a statute of limitations nor the equitable doctrine of laches can be said to begin to run until the fraud is or should have been discovered. The doctrine that federal law applies in determining the date on which a statute of limitations begins to run was extended in Moviecolor Limited v. Eastman Kodak Company, 288 F.2d 80, 90 A.L.R.2d 252 (2d Cir. 1961) (dictim), cert. denied 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961) to include cases at law as well as equity if the cause of action is federal in nature and even though a state statute of limitation applies.

"It is true that a 10b-5 claim is a legal action based upon an implied civil remedy in tort, Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951), and even though the distinction between law and equity must be preserved in federal courts under Art. III, § 2, clause 1 of the United States Constitution, there is no reason to differentiate as between the two kinds of actions in applying the federal policy as to the determining date on which a statute of limitations or laches begins to run. We feel that the remedial policy expressed by Congress in enacting the securities legislation would best be served by making any statute of limitations run only from the date of the discovery of the fraud or from the date the fraud upon reasonable inquiry should have been discovered.

"This decisional rule was specifically applied in a Rule 10b-5 case in Janigan v. Taylor, 344 F.2d 781 (1st Cir. 1965), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). There the court held that although a two year state statute of limitations was applicable to the federal 10b-5 action, nevertheless federal law applied to determine the date the statute began to run, and the Court held that under federal law statutes of limitations do not begin to run in cases involving elements of fraud, until the fraud is, or should be, discovered. The case of Turner v. Lundquist, 377 F.2d 44 (9th Cir. 1967), cited by appellees, is distinguishable. There the Court did look to the California law in determining the date on which the statute began to run, but just as under federal law, and unlike the situation in Janigan v. Taylor, *supra*, California law required discovery of the fraud in cases involving elements of fraud before a statute of limitations began to run." *See also deHaas* v. *Empire Petroleum Co.* (10th Cir. 1970), 435 F.2d 1223.

In Indiana, the general statute of limitations for "relief against frauds" is six years. IC 1971, 34-1-2-1 (Burns Code Ed.). As discussed above, the Indiana Securities Law statute of limitations period was two years at the time of the sale of the securities and at the time of suit. We conclude that the securities law limitation period should govern the violations of federal securities law sections 77q, 78j and Rule 10b-5. These federal provisions clearly are not identical to the civil liability section of the Indiana Securities Law. IC 1971, 23-2-1-19(a) (Burns Code Ed. and Burns Supp. 1975). The Indiana statute specifically recognizes the defense of defendant's lack of knowledge of the untruth of his representations, while, on its face, Rule 10b-5 acknowledges no defenses. Nonetheless, given the present trend to consider sections 77q, 78j, and Rule 10b-5 applicable to negligent as well as intentional misrepresentations,[11] and given

---

11. *See Parrent* v. *Midwest Rug Mills, Inc., supra; Vanderboom* v. *Sexton, supra; Myzil* v. *Fields* (8th Cir. 1967), 386 F.2d 718, *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed2d 1143 (1968), *Contra, Charney* v. *Thomas* (6th Cir. 1967), 372 F.2d 97; *Rice* v. *United States* (10th Cir. 1945), 149 F.2d 601; *Trussell* v. *United Underwriters, Ltd.* (D. Colo. 1964), 228 F. Supp. 757.

that the Indiana general fraud statute of limitations applies only when all the elements of common law fraud are alleged and proved,[12] it is evident that the Indiana securities law more closely tracks the federal provisions and more closely effectuates the federal policy than the Indiana general fraud provisions. *Accord, Corey* v. *Bache & Co., supra.* We conclude that the Indiana Securities Law limitation period of two years is applicable in actions alleging violations of 15 U.S.C. §§ 77q, 78j, and Rule 10b-5. We further conclude that the period begins to run, according to federal decisional law, when the fraud is or should have been discovered.

Our review of the record in the light most favorable to plaintiff Green discloses that by January 1968 Green was aware of misrepresentations made by Karol during the securities transaction. In the fall of 1966, Karol knew of a moratorium on debenture interest and had received a financial report which showed that Ingenio la Garita had liabilities of $400,000.00 and assets of $51,00.00. Karol did not mention these material facts to Green prior to Green's purchase of the corporation's stock and debentures. Apparently, Karol received a letter in September 1966 written by Jimmy Adams, in which Adams questioned the integrity of Sloan Smith, the president of the corporation. In November 1966, Karol told Green that he had checked out Smith by employing an ex-FBI agent to investigate and that he received a "triple-A" report on Smith. Karol did not tell Green about the Adams letter.

In January 1968, Green received a copy of the Adams letter, which was addressed to Karol. In February 1968, Green received a letter from Karol, in which Karol professed his honesty and suggested "misappropriation of funds and fraud from those in control" of the corporation. In the summer of 1968, Green saw a copy of an unfavorable report of Don Johnson, an ex-FBI agent. Green testified as follows:

12. *See Colonial Nat'l Bank* v. *Bredenkamp* (1972), 151 Ind. App. 366, 279 N.E.2d 845; *Ballard* v. *Drake's Estate* (1937), 103 Ind. App. 143, 5 N.E.2d 671.

"Q. Now, as a result of that meeting [the January 1967 stockholder's meeting in Costa Rica], did you not have all the information that you felt was necessary to make an investment?

"A. All the information that was necessary? Of course, not.

"Q. Of course, not?

"A. Of course, not.

"Q. Now what more information would you —

"A. I didn't have the information that Karol had about the letter from Jimmy Adams for example, about the dossier by Don Johnson, the ex-FBI agent. I didn't have any of that information at my disposal. If I did, I wouldn't have made the investment.

"Q. You would not have made the investment?

"A. No, of course not.

\* \* \*

"Q. Now, Doctor, when did you learn about this report of Don Johnson?

"A. I became aware of that in 1968.

"Q. You know approximately when?

"A. In the summertime. That's all I can tell you; maybe July, August, somewhere around there.

"Q. Would that have been at the meeting—

"A. There was no meeting. There was a private investigation on my part.

\* \* \*

"Q. And what was your reaction to that report?

"A. Well, the report was obviously—obvious that the man was a fraud.

"Q. The report indicated that the man was obviously a fraud?

"A. That Sloan Smith was a fraud, right.

"Q. Now, at that point, did you make up your mind at that point then that Herb Karol was a crook?

"A. No, I made up my mind before that.

"Q. Oh, I see. When did you make up your mind?

"A. When I got the letter from Jimmy Adams.

"Q. And when was that?

"A. In January of 1968.

"Q. So at that point you determined in your own mind that you had been defrauded by Herb Karol?

"A. And Sloan Smith.

"Q. In January of 1968?

"A. And Sloan Smith."

Green's own testimony clearly establishes that he was aware of fraud in the securities transaction in January 1968. He received more indications of nondisclosure in the summer of 1968. Yet, he did nothing until he received a letter from an attorney in June 1971, suggesting that he might have a cause of action for securities law violations. Even then, the present suit was not filed until May 1972. Clearly, the two-year statute of limitations began to run at least by the summer of 1968, when the fraud was discovered and confirmed, and Green's action was barred by the summer of 1970. Green presented no evidence of due diligence, and the trial court properly did not submit the statute of limitations question to the jury.

Since Green's actions for violations of federal securities laws were barred by the applicable statutes of limitations, we conclude that Karol's motion for directed verdict was properly granted.

## C. Waiver of Statute of Limitations Defenses

Green contends that Karol waived the defense of the statute of limitations as to violations of 15 U.S.C. §§ 77q. 78j, and Rule 10b-5 when Karol's counsel, in arguing for a directed verdict, stated:

"We do agree that the statute of limitations set forth in the federal statute is not applicable to 77(Q) and 78(J), which are the general fraud sections. Obviously, then we're not entitled to the statute of limitations verdict on those items. However, those are also subject to laches, and we feel, if the Court please, that there is little question about the fact that plaintiff declares unequivocably (sic) that he knew of this whole mess in January 1968 and he has waited four and one-half years before he did anything about it."

Green also contends that Karol waived his right to assert the applicability of the 1967 version of the Indiana Securities Law statute of limitations when he quoted, in argument on the directed verdict, language more similar to the language of the 1969 version.

At the close of the directed verdict argument, the trial court stated:

> "Count I, I suspect I'm going to have to resolve for myself the conflicts about statute of limitation and laches in application to each one of the particular subsections."

We cannot say, as a matter of law, that Karol's counsel's statements amounted to an unequivocal waiver of his well-pleaded statute of limitations defenses. At most, he incorrectly stated the law. His errors of law in arguing to the trial court cannot preclude the trial court from ascertaining the law and correctly applying it. We conclude that there was no waiver of the statute of limitations defense.

### D. Money Had and Received

We find no evidence to support Karol's liability to Green on a common law court of money had and received. Green's checks for the purchase of Ingenio la Garita securities were made payable to the corporation and were indorsed by Sloan Smith, the corporation's president. There is no evidence that Karol received any of Green's money.

In *Conklin* v. *Smith* (1852), 3 Ind. 284, the Court stated:

> "To sustain a count for money paid, laid out, and expended, there must have been a payment *to a third party*, at the request of the defendant, express or implied, on a promise, express or implied, to repay the amount." (emphasis in original).

There is no evidence that Karol requested Green to pay money to the corporation for the benefit of Karol. The trial court did not err in directing a verdict for Karol on this issue.

We find no reversible error, and the judgment of the trial court is affirmed.

Garrard, J. and Hoffman, J., concur.

NOTE.—Reported at 344 N.E.2d 106.